Ralph DESSAUER and Rebecca Dessauer, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 20672.

United States Court of Appeals, Eighth Circuit.

Oct. 12, 1971.

---

8. Transcript at 317.

9. Transcript at 313.

Thomas H. Krise, Indianapolis, Ind., for petitioners-appellants.

David English Carmack, Atty., Tax Div., Dept. of Justice, Washington, D. C., Johnnie M. Walters, Asst. Atty. Gen.,

Meyer Rothwacks, Harry Baum, Attys., Tax Division, Dept. of Justice, Washington, D. C., for respondent-appellee.

Before MATTHES, Chief Judge, GIBSON, Circuit Judge, and HENLEY, District Judge.*

HENLEY, Chief District Judge.

This is a petition to review a determination of the Tax Court fixing the federal income tax liabilities of petitioner, Ralph Dessauer of Springfield, Missouri, for calendar years 1964 and 1965. Dessauer v. Commissioner of Internal Revenue, 54 T.C. 327 (1970). Petitioner's wife who was a party to the returns filed by petitioner is a nominal party to this action, but for practical purposes her presence in the case can be ignored. Most of the facts in the case have been stipulated.

During 1964 and 1965 taxpayer owned 70 percent of the stock in Huddleston Brothers Sales, Inc. and all of the stock in Washington Trailer Sales, Inc. Both corporations were engaged in the sale of mobile homes and many of their sales were made on installment credit. Most of the homes were sold for basic prices of between $3,500 and $4,000, and most of the credit sales were financed over a period of seven years with the buyers making monthly installment payments. Both of the corporations were small business corporations falling within the terms of Subchapter S of the provisions of the Internal Revenue Code relating to income taxes, 26 U.S.C.A. § 1371 et seq., and as a consequence the undistributed taxable income of the corporations was includible in the gross incomes of the individual shareholders, 26 U.S.C.A. § 1373.

Credit purchasers of homes from the corporations executed in favor of the corporations conditional sales contracts dischargeable by monthly payments extending usually over an 84-month period. The face amount of each contract reflected the cash price of the home less down payment, plus a finance charge,

---

* Chief Judge, Eastern District of Arkansas, sitting by designation.

and a charge for insurance. The contracts revealed that they would be transferred to a finance company.

As mobile homes were sold, the selling corporations executed notes in favor of the finance company secured by pledges of the conditional sale contracts that had been executed by the home buyers. As conditional security the finance company had a dealer's reserve contract with the selling corporations, and all of the notes executed by the selling corporations were personally guaranteed by the taxpayer and his wife.

The face amounts of the notes executed by the corporations to the finance company were equal to the outstanding time balances on the respective conditional sales contracts. The finance company advanced cash to the selling corporations in amounts less than the face amounts of the notes. In each instance the difference was the amount of the finance charge made by the lending corporation to the selling corporation.

There was no relationship between the finance company and the selling corporations, and all of the dealings between them were at arm's length.

Upon audit of the returns of the selling corporations for fiscal 1964 and fiscal 1965 the Commissioner determined that the transactions between the selling corporations and the finance company were "dispositions" of installment paper with respect to which gains or losses had to be recognized as provided by section 453(d) of the Internal Revenue Code, 26 U.S.C.A. § 453(d). The result of that determination was to increase the undistributed income of the selling corporations for each of the years in question, and that increase, in turn, increased the taxable income of the taxpayer for both years. Deficiency assessments against him were made and were duly challenged by him in the Tax Court.

The Tax Court upheld the Commissioner, and to the extent that the determination of that Court involves findings of fact we are bound by those findings unless they are "clearly erroneous" as that term is now conventionally understood. 26 U.S.C.A. § 7482(a).

Insofar as here pertinent, section 453(d) (1) of the Code provides in substance that if an installment obligation is sold "or otherwise disposed of", gain or loss shall result to the extent of the difference between the "basis of the obligation" and:

"(A) the amount realized, in the case of * * * a sale or exchange, or

"(B) the fair market value of the obligation at the time of * * * disposition otherwise than by sale or exchange."

Section 453(d) defines "Basis of obligation" as being "the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full."

The taxpayer conceded in the Tax Court and concedes here that the dealings of the selling corporations with the finance company were dispositions of the conditional sales contracts having tax consequences as measured by section 453(d) of the Code, and the taxpayer does not quarrel with the "bases" determined by the Commissioner under section 453(d) (2), which bases are the subtrahends that must be employed in determining whether and to what extent the dispositions of the contracts resulted in gains or losses.

In the Tax Court both sides seem to have proceeded on the theory that the minuends that had to be used in determining the gains or losses from the dispositions were the fair market values of the contracts. In other words, both sides apparently proceeded on the theory that these particular dispositions fell within section 453(d) (1) (B) rather than within section 453(d) (1) (A). The dispute between the parties was as to what the contracts were worth on the market, that is to say, what would a reasonable and willing seller have demanded for them and what would a reasonable

and willing buyer have been willing to pay for them.

The Commissioner determined that the market values of the contracts were properly measured by the amounts of cash actually advanced to the selling corporations by the finance company, and in that determination he was upheld by the Tax Court. The taxpayer contended before the Tax Court and contends here that the market values of the contracts were actually substantially less than the amounts of cash advanced on them by the finance company.

In support of his position the taxpayer called two expert witnesses who testified before the Tax Court that the principal risk taken by a buyer of installment paper covering mobile homes is the expense of repossession; that the taxpayer sold many homes to individuals who were marginal credit risks, and that his repossession experience was above the average for the mobile home industry. Both experts were of the opinion that in order to determine the reasonable market values of the contracts the face amounts thereof or the amounts due thereon would have to be discounted heavily. One expert fixed the proper discount rate at 20 percent; the other thought that 25 percent would be correct.

In its opinion the Tax Court said, among other things (54 T.C. at 330–331):

"Once it is determined that use of the installment method is no longer permissible, the gain or loss resulting from the 'disposition' of the obligations is to be calculated under either 453(d) (1) (A) or (B). Here the parties apparently proceeded under (1) (B) because of the term 'disposition' appearing therein. This we think was not necessary under the facts of this case.

"In our Findings of Fact we found the corporations and the finance companies to be unrelated and we have no other evidence before us to indicate that the transactions were other than at arm's length. This being so, we think, as did the Fifth Circuit in Hegra Note Corporation v. Commissioner [of Internal Revenue], 387 F.2d 515 (C.A.5, 1967), * * * that it is not important to pigeonhole the transactions as either within 453(d) (1) (A) or (1) (B) for the result should be the same under either. The essential point is that the corporations voluntarily exchanged the installment obligations for cash, therefore under (1) (A), the amount realized is the amount of cash received and under (1) (B), the fair market value of the obligations is also the amount of cash received, for as we have found, the parties were dealing at arm's length, and 'Absent a readily ascertainable value * * * the values "of * * * two properties exchanged in an arms-length transaction are either equal in fact, or are presumed to be equal." ' United States v. Davis, 370 U.S. 65, 72 [82 S.Ct. 1190, 8 L.Ed.2d 335] (1962)."

In connection with the instant petition taxpayer contends that it is necessary to categorize the transactions specifically, that section 453(d) (1) (B) is the governing provision, and that the Tax Court erred in refusing to accept the testimony of the taxpayer's expert witnesses. The Commissioner insists that no error was committed by the Tax Court, and that its judgment should be affirmed.

While the transactions between the selling corporations and the finance company took the form of loans, we think that the dispositions were analogous to sales with recourse, and had the Tax Court seen fit to so characterize them and thus bring them within the provisions of section 453(d) (1) (A), we probably would have little difficulty with that characterization. However, as indicated, the Tax Court found it unnecessary definitely to characterize or categorize the transactions because, in the Tax Court's view, the market value of the contracts was properly measurable

by the cash advanced by the finance company. We find ourselves unable to accept that approach.

Where an item of property the market value of which is difficult to ascertain is exchanged for an item the market value of which is established or readily ascertainable, and where the parties have dealt at arm's length, it is frequently logical or at least convenient to consider that the value of the former item is equal to the value of the latter.

That is exactly the situation that was presented in United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), cited by the Tax Court. In *Davis* the taxpayer had transferred to his wife in anticipation of divorce certain shares of Du Pont stock the value of which was, of course, readily ascertainable. In exchange the taxpayer received a release of certain inchoate marital rights of the wife in his property which would not vest in her unless she survived him as his widow. For federal tax purposes it was necessary to determine the value of those inchoate rights if the taxpayer was to be held liable for a taxable gain incident to the transaction. The Court of Claims held that the rights could not be valued, and that, consequently, no gain could be determined. Davis v. United States, 287 F.2d 168, 152 Ct.Cl. 805 (1961). The Supreme Court reversed, and in reversing employed the language quoted by the Tax Court in this case.

We do not think that *Davis* is applicable here. There is nothing inherently difficult in ascertaining the value of commercial paper which is regularly bought and sold on the market. And, assuming that the transactions here involved were loans, as they purported to be, there is simply no rational basis for any assumption that a lender of money on the strength of collateral consisting primarily of commercial paper is going to advance to the borrower in cash the

precise market value of the collateral. Indeed, we think that the initial assumption would be to the contrary.

■ In a transaction governed by section 453(d) (1) (A) the "amount realized" from the sale or exchange of the installment obligation is of controlling importance. The relationship between that amount and the fair market value of the obligation at the time of the transaction is not material.[1]

■ In a transaction governed by section 453(d) (1) (B), however, "fair market value of the obligation at the time of * * * disposition" is the controlling factor; "amount realized" is unimportant, except to the extent that that amount may happen to coincide with "fair market value." Conceding that in the absence of evidence as to market value, a fact finder may be justified in inferring with respect to an arm's length transaction that the "amount realized" for and the "fair market value" of the obligation are the same, this is not such a case because here there was substantial evidence before the Tax Court to the effect that the selling corporations received more from the finance company than the installment contracts were worth on the market.

■ The decision of the Tax Court is reversed and the cause is remanded with directions to that Court to determine whether the dispositions of the contracts fell within section 453(d) (1) (A) or whether they fell within section 453(d) (1) (B). If the Tax Court determines that the transactions fell within the latter subsection, it should proceed to make specific findings as to market value. In doing so it should consider the testimony offered by the taxpayer, although it is not required, of course, to accept that testimony uncritically. If either side wishes to introduce additional evidence as to market value, it should be allowed to do so.

---

1. Obviously, of course, terms of sale and other factors may affect the amount realized. For example, a sale of an installment contract with recourse and with additional security may produce more money for the seller than will a simple sale without recourse.