CHARLES SERIANNI, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

JOSEPHINE M. SERIANNI, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 847–77, 1001–81, 1079–81.    Filed May 31, 1983.

*Hugh G. Isley, Jr., Louis J. DeReull*, and *Jack R. Loving*, for the petitioner in docket Nos. 847–77 and 1079–81.

*Charles P. Sacher* and *Nicholas E. Christin*, for the petitioner in docket No. 1001–81.

*Linda R. Dettery*, for the respondent.

STERRETT, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| 847-77[1] | Charles Serianni | 1973 | $361,702 |
| | | 1974 | 21,067 |
| 1001-81 | Josephine M. Serianni | 1975 | 343,052 |
| 1079-81 | Charles Serianni | 1975 | 376,715 |

The primary issue in this case involves the question of which of the two petitioners should properly be taxable on a capital gain from a stock liquidation that was the subject of their 1973 divorce suit. Consequently, the interests of Charles Serianni and Josephine M. Serianni are clearly adverse in this case, and respondent is in the enviable position with respect to the primary issue of being an interested bystander. Respondent obviously acknowledges that the capital gain should be recognized only once by one of the petitioners and thus concedes that, regardless of which petitioner we ultimately find for, our decision in the other dockets on this issue must be for petitioner and against respondent.

Moreover, our ultimate decision with respect to the primary issue will be determinative of which other issues we must decide. If we should find that Charles Serianni is liable for the tax on the capital gain either solely in 1973 or in taxable years 1973 and 1974 (docket No. 847–77), then no additional issues must be considered since they have all been agreed to previously by the parties. However, if we should determine that Charles Serianni is liable for the capital gains tax in 1975 (docket No. 1079–81), then we must also address the issue of whether he must include additional interest in his income for that year. If, on the other hand, we decide that Josephine M. Serianni rather than Charles Serianni is the party properly taxable on the capital gain in question in 1975 (docket No. 1001–81), then we must also determine her basis in the stock and whether she must include additional interest in her income.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

---

[1]Respondent, in his amendment to answer filed May 22, 1980, alternatively asserted a decreased deficiency for 1973 of $314,109 and an increased deficiency for 1974 of $64,707.

Petitioner Josephine M. Serianni (hereinafter referred to as Josephine), resided in Hollywood, Fla., at the time of filing her petition in this case. Her Federal income tax return for the calendar year 1975 was prepared on the cash receipts and disbursements method of accounting and was filed with the Office of the Internal Revenue Service at Chamblee, Ga.

Petitioner Charles Serianni (hereinafter referred to as Charles), also resided in Hollywood, Fla., at the time of filing his petitions herein. His Federal income tax returns for the calendar years 1973, 1974, and 1975 were prepared on the cash receipts and disbursements method of accounting and were filed with the Office of the Internal Revenue Service at Chamblee, Ga.

Josephine and Charles were married on November 23, 1949. In March 1949, prior to their marriage, Charles started a paving business in Florida called Di-Mar Paving Co., with a net worth of $40. In October 1949, his financial condition was such that he had to borrow $90 from Josephine to return to Florida from Stroudsburg, Pa.

Josephine worked prior to marrying Charles and had accumulated $2,400 in cash, and jewelry with an approximate value of $7,000. Since Charles had no credit at the time of their marriage, Josephine transferred her $2,400 in savings along with her jewelry to Charles for use in the business. At that time, Charles told her that they would be business partners, a representation which he subsequently repeated to her. Charles deposited the $2,400 into the business checking account and used the jewelry as security for a bank loan for the business. By making her savings and jewelry available to the business, Josephine supplied a substantial portion of the capital necessary to get the business started.

Shortly after their marriage, Josephine and Charles purchased a house in joint name from which the business was conducted for several years. The couple during those years maintained only one checking account which was used in the conduct of the business. Josephine worked in the business on a regular basis acting as a message center for the business, taking and making telephone calls. She also did the billing along with whatever other services Charles requested to further the business. Until the business was removed from the

house, a period of at least 3 years, Josephine regularly drew a salary of $35 and Charles a salary of $75 per week.

Charles proved to be an industrious, skillful, and dedicated businessman and consequently has enjoyed extraordinary success in his business endeavors. In addition to Di-Mar Paving Co., Charles formed Hollywood Quaries, Inc., Florida Asphalt, Inc., Di-Mar Trucking, Inc., Ferncrest Mining Co., Inc., and Ferncrest Land Co., Inc. He also obtained a substantial interest in Servan Land Co., Inc., a Florida corporation organized in 1960, which owned a golf course and country club in Broward County, Fla. All of these interests can be traced back to Di-Mar Paving Co., the earnings of which provided the financial means by which Charles entered each succeeding business.

On July 19, 1972, Charles petitioned for dissolution of his marriage to Josephine. In the divorce proceeding that followed, the Circuit Court of the 17th Judicial Circuit of Florida, in and for Broward County, found that Josephine "by clear and convincing evidence has proven beyond a reasonable doubt special equities in all of the properties of [Charles], real, personal and intangible." In its decree of April 24, 1973, the court then went on to state:

> The equities of this cause are with the wife. Her special equities are declared to be the 26.79% stock interest of Husband in Servan Land Company, Inc., which represents an approximate equity of $1,018,020 or 22% of Husband's disclosed net worth.

The court based its holding on the fact that "from the capital acorn planted by [Josephine], the entire tree of Serianni businesses with all their branches sprang." The court also found that Josephine had performed personal services for Charles over and above her regular marital obligations.

The 26.79-percent stock interest of Servan Land Co., Inc. (hereinafter referred to as Servan) consisted of 187.5 shares which were registered in the name of Charles Serianni. The remaining shareholders of Servan, the number of shares held by each, and their respective percentages of interest are shown as follows:

| Shareholder | Number of shares | Percentage interest |
|---|---|---|
| Jack Farber | 60 | 8.571% |
| Estate of Malcolm Neuwahl | 7.5 | 1.0714 |

| Shareholder | Number of shares | Percentage interest |
|---|---|---|
| Hamilton C. Forman | 30 | 4.2857% |
| George Condeelis | 15.75 | 2.25 |
| A. I. Savin | 216 | 30.8572 |
| Victor and Marguerite H. Byrne | 23.25 | 3.3214 |
| Doris D. Forman | 15 | 2.1429 |
| Joseph and Helen Varon | 70 | 10 |
| Alice O'Neill | 25 | 3.5714 |
| Rose O'Neill | 25 | 3.5714 |
| Terrance L. O'Neill | 25 | 3.5714 |
| | 512.5 | 73.2142 |

Neither Charles nor Josephine was related by blood or marriage to any of the remaining shareholders and none of the remaining shares were constructively owned by either of the Seriannis. The stock registry of Servan does not reflect any Servan stock ever having been registered in the name of Josephine. Josephine contributed neither money nor services directly to Servan.

The major property of Servan was a golf course, a clubhouse, and a lodge located on approximately 180 acres of land in Broward County, Fla. Certain of the assets of Servan were owned by its wholly owned subsidiary, Rolling Hills Golf Lodge, Inc. The business operated under the name of Rolling Hills Country Club.

By an "Agreement for Purchase and Sale" dated February 16, 1973, Servan contracted to sell property owned by it and its subsidiary to William Gundlach, trustee. Simultaneous with this agreement, Charles Serianni and A. I. Savin and his wife, Anna Savin, also agreed to sell their individually owned property adjacent to the property described in the Servan agreement for purchase and sale to William Gundlach, trustee. The two agreements for purchase and sale of real estate were conditioned upon each other, and because of zoning requirements the total purchase price for both parcels exceeded their individual values.

On March 15, 1973, the directors and stockholders of Servan adopted a resolution approving the liquidation of Servan pursuant to section 337 of the Internal Revenue Code of 1954. A resolution to dissolve and liquidate Rolling Hills Golf Lodge, Inc., was subsequently approved by its directors and stockholders on April 9, 1973. Thus, at the time of the dissolution of Josephine's and Charles' marriage, Servan had a sale pending of property owned by it and its subsidiary, Rolling Hills Golf

Lodge, Inc., and had adopted a plan of liquidation in order to facilitate the distribution of the proceeds from such sale.

The closing of the sale by Servan to William Gundlach, trustee, along with the closing of the accompanying sale by Charles, A. I. Savin, and Anna Savin took place on June 12, 1973. However, prior to any actual distributions by Servan of its sales proceeds in liquidation, the Broward County Circuit Court issued further orders dated June 11, 1973, and July 30, 1973, which stayed its judgment for the dissolution of marriage pending appeal and directed that the 26.79-percent stock interest in Servan be placed in escrow with the American National Bank & Trust Co. of Fort Lauderdale.

The net closing proceeds of the sale by Servan were deposited in its bank account on June 14, 1973, and Servan commenced issuing liquidating dividends of $5,000 per share to its stockholders 5 days later. On July 20, 1973, Servan issued a check in the amount of $937,500 payable to Citizens National Bank of West Hollywood. This check represented the amount of liquidating dividends payable with respect to the 26.79-percent stock interest and was used to purchase a certificate of deposit in the name of Servan at the Citizens National Bank of West Hollywood.

The escrow agreement created pursuant to the court's orders was finalized between the respective parties on August 14, 1973, at which times Charles instructed Citizens National Bank of West Hollywood to issue a check payable to American National Bank & Trust Co. of Fort Lauderdale in payment of the certificate of deposit together with any interest accrued thereon. In response to Charles' request, Citizens National Bank of West Hollywood issued a cashier's check to American National Bank & Trust Co. of Fort Lauderdale in the amount of $942,317.06, which included the $937,500 certificate of deposit plus interest of $4,817.06. This check was deposited to the American National Bank & Trust Co. of Fort Lauderdale along with the stock certificates representing the 26.79-percent interest in Servan on August 14, 1973.

On March 13, 1974, Servan distributed a second liquidating dividend to its stockholders in the amount of $665 per share. On the same date, a cashier's check was purchased by Servan in the amount of $124,687.50 payable to the American National Bank & Trust Co. of Fort Lauderdale, which repre-

sented the second liquidating dividend with respect to the 26.79-percent stock interest. This check was transmitted to the American National Bank & Trust Co. of Fort Lauderdale by Josephine's lawyers by letter dated March 15, 1974.

The appellate review of the Broward County Circuit Court's divorce decree ended on May 30, 1975, when the Supreme Court of Florida denied Charles' petition for rehearing. Following this decision, on June 10, 1975, the American National Bank & Trust Co. of Fort Lauderdale disbursed from the escrow account the sum of $1,067,004.56 to Josephine's attorneys on her behalf. This sum represented the two checks delivered in escrow by Servan in the amount of $942,317.06 on August 14, 1973, and in the amount of $124,687.50 on March 15, 1974. Additionally, a second distribution was made by the American National Bank & Trust Co. of Fort Lauderdale to Josephine's attorneys on her behalf on October 9, 1975, in the amount of $186,067.20. This check represented the earnings on the funds in the escrow account.

Josephine reported the interest income of $186,067 on her 1975 Federal income tax return. However, neither Charles nor Josephine reported either the capital gain derived from the liquidating distributions on the 26.79-percent interest in the Servan stock or the $4,817.06 of interest income earned thereon on their Federal income tax returns for the years 1973 through 1975.

In his statutory notice of deficiency dated October 29, 1976 (docket No. 847–77), respondent determined that Charles realized a long-term capital gain of $984,830 in 1973 on the disposition of his capital stock in Servan.[2] Additionally, by amendment to answer in docket No. 847–77, filed May 22, 1980, respondent affirmatively alleged deficiencies in income taxes for 1973 and 1974 due from Charles under an alternative theory of taxation. While not abandoning the primary position and theory of taxation included in the statutory notice of deficiency for 1973, respondent alleged in the alternative that Charles is taxable for the years 1973 and 1974 on the

---

[2]Respondent's further determination that certain payments totaling $24,302 and $30,095 for the years 1973 and 1974, respectively, made by Charles to Josephine were not deductible alimony payments was settled by agreement of the parties and is not before this Court for resolution.

liquidation of Servan "as distributions in liquidation were made." Respondent issued a second (protective) statutory notice of deficiency to Charles, dated October 21, 1980 (docket No. 1079–81), in which he determined that Charles realized a long-term capital gain of $973,538 in 1974, "upon the liquidation of Servan Land Company, Inc. * * * [which] represents the portion of the distribution released from an escrow account in 1975." Consistent with this theory, respondent further determined that Charles received interest income of $4,817, representing interest that was released from an escrow account in 1975 and that was earned on proceeds from the liquidation of Servan.[3]

With respect to Josephine, her liability for alleged Federal income tax deficiencies for 1973 and 1974 was the subject of a previous case before this Court (docket No. 623–77). That case was disposed of by stipulated decision on March 17, 1978.

Josephine's 1975 Federal income tax return was first examined pursuant to notice dated May 17, 1977. This examination was originally closed, and Josephine's 1975 Federal income tax return was accepted as filed. Thereafter, respondent reopened the examination of that year by reopening memorandum dated March 1, 1978;[4] and, in his statutory notice of deficiency dated October 21, 1980 (docket No. 1001–81), respondent determined that Josephine realized a long-term capital gain of $973,538 in 1975 "upon the liquidation of Servan Land Company, Inc., * * * [which] represents the portion of the distribution released from an escrow account in 1975." Consistent with this theory, respondent further determined that Josephine received interest income of $4,817, representing interest that was released from an escrow

---

[3] Respondent's further determination of additional income in the amount of $46,578 based on certain credits includable in income was settled by agreement of the parties and is not before this Court for resolution.

[4] This reopening was necessitated by the Fifth Circuit's decision in *Bosch v. United States*, 590 F.2d 165 (5th Cir. 1979). Prior to that decision, respondent believed that there was no legal basis upon which Josephine could be held taxable in 1975 for the capital gain realized on the liquidation of Servan. However, upon learning of the *Bosch* decision, respondent determined that there was a definite basis upon which Josephine could be held responsible for the capital gains tax and therefore reopened the year in question.

Petitioner Josephine originally argued that respondent was barred from reopening her 1975 tax year; however, she subsequently conceded this issue on brief.

account in 1975 and that was earned on proceeds from the liquidation of Servan.

The present posture of these consolidated cases is that long-term capital gain has been asserted by respondent against Charles solely in 1973 (statutory notice, docket No. 847–77); partially in 1973 and 1974 (amendment to answer, docket No. 847–77); and solely in 1975 (statutory notice, docket No. 1079–81); and, long-term capital gain has been asserted against Josephine solely in 1975 (statutory notice, docket No. 1001–81).[5]

## OPINION

The principal issue before us is whether Charles or Josephine properly should be taxable on the capital gain attributable to the 26.79-percent interest in the Servan stock awarded to Josephine in their divorce proceeding by the Broward County Circuit Court. Respondent is in the position of a third-party stakeholder in this case and, as such, offers several alternative theories under which either Charles or Josephine is the party properly liable for the capital gains tax.

With respect to Charles, respondent advances two different grounds upon which he could be held responsible for the capital gains tax from the liquidation of Servan either entirely in 1973, divided between 1973 and 1974, or entirely in 1975. First, as to 1973 alone, respondent asserts that Charles may be viewed as transferring appreciated property to Josephine in recognition of her marital rights, which would be in effect a lump-sum alimony settlement. Alternatively, respondent argues that Charles could be liable for the capital gains tax, partly in 1973 and partly in 1974, or entirely in 1975, on the theory that he had earned the gain in fact, but had anticipatorily assigned this income to Josephine.

With respect to Josephine, respondent relies on the fact that the Circuit Court's award of a special equity interest in the Servan stock recognized her vested right to such stock.

---

[5]These cases were consolidated for trial, briefing, and opinion pursuant to a joint motion to consolidate filed Dec. 9, 1981, based on the fact that Charles and Josephine were former husband and wife, and the income tax liabilities determined by respondent against Charles (docket Nos. 847–77 and 1079–81) for 1973, 1974, and 1975, and against Josephine (docket No. 1001–81) for 1975 involved the same evidence.

Consequently, respondent argues that she took ownership of the stock with its original basis and the capital gain upon liquidation is therefore attributable to her.

After examining all of the theories and relevant authority advanced by the parties, we believe that the crux of this case is whether the transaction is properly governed by the principles of *United States v. Davis*, 370 U.S. 65 (1962), or *Bosch v. United States*, 590 F.2d 165 (5th Cir. 1979). If *Davis* applies, then Charles would be taxable on the appreciation inherent in the Servan stock on its transfer to Josephine in 1973; however, if the principles in *Bosch* are applicable, then Josephine, as a cash basis taxpayer, would be the party liable for the capital gains tax upon the receipt of the liquidation proceeds in 1975.

In the landmark case of *United States v. Davis, supra*, the Supreme Court held that a transfer of appreciated property between spouses in a divorce proceeding constitutes a taxable event. In *Davis*, the husband transferred appreciated stock to his estranged wife pursuant to a separation agreement, which was later incorporated into a divorce decree. Under applicable Delaware law, all property transferred was that of the husband and was made in settlement and satisfaction " 'of any and all claims and rights against the husband whatsoever (including but not by way of limitation, dower and all rights under the laws of testacy and intestacy).' " *United States v. Davis, supra* at 67.

The issue before the Court in *Davis* was whether this transaction represented a nontaxable division of property between two co-owners or whether the transaction constituted a taxable event to the husband whereby he realized gain to the extent of the appreciation inherent in the stock. In concluding the latter, the Court determined that under Delaware law the wife had no interest over the management or disposition of her husband's property, that her rights were not descendable, and that upon dissolution of the marriage she shared in the property only to the extent deemed reasonable by the courts. Thus, the Court found that the wife's rights in her husband's property were more of a personal liability of the husband than a property interest. Consequently, the transaction equated more with the payment of alimony and support than the division of property by co-owners, so that the wife received the

assets with a stepped-up basis equal to their current fair market value.

The application of the principles in *Davis* were limited by the Fifth Circuit in its decision of *Bosch v. United States, supra. Bosch*, like the instant case, involved the tax consequences of the awarding of a Florida special equity interest.

Under Florida law, the term "special equity" describes a vested interest in property brought into the marriage or acquired during the marriage because of contributions of services or funds over and above normal marital duties. *Eakin v. Eakin*, 99 So. 2d 854 (Fla. 1958); *Heath v. Heath*, 103 Fla. 1071, 138 So. 796 (1932). An award in recognition of this right is not alimony or dependent upon the right to recover alimony under Florida law. *Eakin v. Eakin, supra*.

The Florida Supreme Court has recently addressed the distinction between the awarding of a "special equity" interest and the awarding of "lump sum alimony" in a trio of cases. *Canakaris v. Canakaris*, 382 So. 2d 1197 (Fla. 1980); *Duncan v. Duncan*, 379 So. 2d 949 (Fla. 1980); *Ingram v. Ingram*, 379 So. 2d 955 (Fla. 1980). In these cases, the Florida Supreme Court explained that the award of a special equity constitutes a division of an already vested property interest while the award of lump-sum alimony is not dependent upon a finding of a prior vested right but only tries to do equity and justice between the parties and insure that the less-propertied spouse will have sufficient assets to live on after the marriage is dissolved. In clarifying this distinction, the Florida Supreme Court stated:

> The property interest or lien concept of "special equity" is entirely distinct from the determination of parties' equities in a lump sum alimony award. The term "special equity" should not be used when considering lump sum alimony; rather, it should be used only when analyzing a vested property interest of a spouse. See *Ball v. Ball*, 336 So. 2d 5 (Fla. 1976); *Eakin v. Eakin: Heath v. Heath.* [*Canakaris v. Canakaris*, 382 So. 2d at 1200–1201.]

The Fifth Circuit addressed the Federal income tax consequences of the awarding of a "special equity" under Florida law in its decision in *Bosch v. United States, supra*. In *Bosch*, the wife advanced funds during their marriage to improve realty held by the husband solely in his name. Upon their divorce, the trial court awarded the wife a special equity in this land and ordered the property partitioned. The wife

subsequently sold her interest in this property and the question before the court was her proper basis in the property for purposes of calculating her gain or loss on the sale. The wife argued that under *Davis* she took a basis in the land equal to its fair market value on the date of the final divorce decree. However, the Fifth Circuit held that the parties must look to the type of interest being awarded. In examining the relevant law, the Fifth Circuit stated:

Florida has long recognized a "special equity" in a wife where she has made identifiable contributions to her husband's property during marriage even though the special equity only comes into actual identifiable form upon the termination of the marriage status. * * *

\* \* \* \* \* \* \*

The wife's special equity interest in Florida differs materially from the interest at issue in *United States v. Davis*. There, the thousand shares of stock awarded to the wife were given under the terms of a property settlement in which the wife expressly relinquished all of her marital rights. As noted by the Supreme Court,

[T]he then Mrs. Davis agreed to accept this division "in full settlement and satisfaction of any and all claims and rights against the husband whatsoever (including but not by way of limitation, dower and all rights under the laws of testacy and intestacy) * * * "

370 U.S. at 66–67, 82 S.Ct. at 1191. Nothing in the Delaware law appears to create an interest such as the "special equity" recognized in the Florida cases. [*Bosch v. United States*, 590 F.2d at 167–168.]

The Fifth Circuit thus concluded that the divorce decree awarding a special equity to the wife constituted a "division of existing property interests, and it did not constitute a taxable event to the husband." *Bosch v. United States, supra* at 168. Consequently, the wife took a basis in the property equal to the amount originally paid by the husband when he purchased it.

In the instant case, the Broward County Circuit Court found in its decree of April 24, 1973, that Josephine contributed $2,400 in cash and $7,000 in jewelry to finance Charles' start in business when they were first married. Additionally, the court found that Josephine had performed services for Charles over and above her marital obligations, which allowed Charles to pursue his varied business interests. Consequently, the Circuit Court determined that Josephine had "special equities in all the properties of Husband, real, personal and intangi-

ble." To satisfy this special equity, the court awarded Josephine Charles' 26.79-percent stock interest in Servan.

In claiming that Charles is the party properly taxable on the capital gain from the Servan stock, Josephine attempts to distinguish this case from *Bosch* on two grounds. First, she never contributed any funds, time, or effort to the formation or success of Servan; and, secondly, *Bosch* entailed a situation where there was a physical partition of property. We do not find these differences controlling.

While it is true that the Circuit Court awarded Josephine a special equity in property to which she never specifically contributed either money or services, that does not make it any less a special equity interest. Similarly, we do not believe the fact that there was no physical partition of property such as existed in *Bosch* renders *Bosch* inapplicable. The recent decisions by the Florida Supreme Court make it clear that a special equity is separate and distinct from lump-sum alimony and constitutes a vested equitable property right. That determination—that a special equity interest exists—is the operative or penultimate fact. To treat the transfer of stock pursuant to the divorce decree in this case as a lump-sum alimony settlement would require us to completely ignore that finding of the Circuit Court. This we decline to do.

Similarly, we do not find Josephine's contention that this case is governed by the assignment of income principles meritorious. Since the Circuit Court's judgment in this case amounted to a decree awarding Josephine an interest in property which existed prior to the divorce, it is clear that Josephine is the proper party to be taxed on the income she received from the liquidation of Servan. Accordingly, following *Bosch*, we hold that the transfer of the Servan stock from Charles to Josephine was incident to a nontaxable division of property interests and did not constitute a taxable event to Charles.

Since we have determined that Josephine is taxable on the liquidation proceeds of Servan, we now must address the issue of her basis in the Servan stock. The original cost of the stock was $88,650. Josephine would inherit this basis which could be increased by any costs of a capital nature incurred to acquire the stock.

Josephine argues that she should be given a step-up in basis in the Servan stock for her attorneys' fees and costs incurred in obtaining the shares. In support of her contention, she relies on our previous memorandum decision in *Hahn v. Commissioner*, T.C. Memo. 1976–113, which involved the capitalization of attorney's fees in connection with a wife's attempt to obtain ownership in property in a Florida divorce proceeding through the advocation of a special equity. In that case, we found that such legal expenses were nondeductible capital expenditures.

In the instant case, Josephine paid her attorney, Hugo L. Black, Jr., $236,632.35 in legal fees and costs for representing her in her divorce proceeding and appeals. Of this amount, the total costs were $23,231.44 and the remaining $213,400.91 was arrived at under an agreement by which Josephine promised that in the event she was awarded a special equity she would pay Mr. Black 20 percent of the recovery. In his testimony on behalf of Josephine 7 years after the fact, Mr. Black stated that he estimated that no more than $5,000 of such fees and costs were attributable to the personal aspects of the divorce and that the remaining $231,632.35 was allocable to the acquisition of the special equity interest.

On brief, respondent concedes that some portion of this total fee was attributable to the financial recovery of Josephine in her divorce proceeding and should thus be added to her basis in the stock. However, he asserts that Josephine has failed to sustain her burden of proof to substantiate adequately the amounts she claims should be added to her basis.

Although we agree with respondent that Josephine has failed to prove the actual amount of her legal expenses attributable to obtaining the Servan stock, we believe that the fact that the amount of the fee was based on her recovery suggests that the major portion of such fee was attributable to acquiring the Servan stock. Although we are in no position to determine the amount with precise exactitude, applying the well-known principles of *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), we find that $200,000 of Josephine's legal expenses are properly includable in her basis in the Servan stock.

Finally, we address the issue of the taxability of the $4,817.06 of interest earned on the $937,500 certificate of deposit at the Citizens National Bank of West Hollywood from

July 20, 1973, to August 14, 1973. The certificate of deposit in question was purchased with the liquidating dividends of $5,000 per share on the 26.79-percent stock interest awarded to Josephine by the Circuit Court's decree of April 24, 1973. Although this certificate of deposit was registered in the name of Servan, it was held only in this manner until the escrow agreement created pursuant to the court's orders was finalized between the respective parties on August 14, 1973. At that time, interest earned thereon was transferred at the direction of Josephine's divorce attorney to an escrow account at the American National Bank & Trust Co. of Fort Lauderdale.

Josephine argues that since the certificate of deposit was not in her name the $4,817.06 of interest income is taxable to either Charles or Servan, but not to her. We do not agree. It is clear from the facts that Charles did not receive the interest income in question and that said amount was eventually received by Josephine on June 10, 1975, as part of the $1,067,004.56 distribution from the escrow account at the American National Bank & Trust Co. of Fort Lauderdale. The certificate of deposit was held only nominally in Servan's name and was not purchased to benefit either Servan or Charles, personally. Consequently, we hold that Josephine, as the eventual recipient of the interest income in question, is the party properly liable for the tax thereon.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*